Mr. Moen. Correct. May it please the Court. I am Philip Moen, representing the petitioner, Missouri River Energy Services, a non-profit with service obligations to supply power to its members who are municipal utilities providing electric service to commercial, industrial, and residential ratepayers in the Upper Midwest. In 1977, Missouri River obtained firm physical transmission rights to serve its member municipalities through the year 2040 by paying for the construction of a power plant and transmission lines. Around the year 2000, utilities began to form regional transmission organizations, and some, with FERC's encouragement, created electricity markets which charged more to use congested transmission paths. For load-serving entities like Missouri River, these congestion charges represented a substantial increase to their historical service costs, and many were concerned. In response, Congress passed a law requiring FERC to protect load-serving entities from these new congestion charges by enabling them to secure long-term hedges. FERC implemented that requirement in Order 681, invoking throughout a right for load-serving entities to obtain long-term hedges, stating that as long as each load-serving entity When you keep saying hedges, I know that's not a statutory word. What words are you talking about in the statute? So in the statute, Congress uses the words firm transmission rights and then parentheses or equivalent tradable or financial rights. So you only have to get one of the two, right? That's what the or means? I think it's uncontested that what we're talking about are financial rights. Counsel, I'm talking about what Congress commands. Congress commands Congress commands either or, right? One of the two. That is how it reads. That's correct. Okay. And you've always had firm transmission rights? I've always had firm physical transmission rights. Does that end this case? Does that end this case? No, it does not. Okay. You've got to tell me why because I'm just stuck with the language here that Congress passed. I understand. Congress was trying to protect these load-serving entities and providing them something new to really net against the new congestion charges they were receiving. And if you look at FERC's order implementing the statute, FERC is very clear on what it understood Congress to be conveying. Yeah, but I think they can't change what Congress commands, right? That is true. That is true. But the notion of this protection that Congress was trying to provide against these new charges for congestion, that could only be remedied by a financial right that was attached. I'm talking about Congress intended. You don't know that. Well, we can go to FERC's interpretation in Order 681 of what Congress intended because they were very, FERC was very specific in its rulemaking. And I'll draw your attention to paragraph 320 of, this is Order 681, and it reads, and this is a direct quote, the overall thrust of new section 217 of the FPA, read in its entirety, is the protection of transmission rights used to satisfy native load obligations. Yeah, we just clarified that you've got the transmission rights. Well, the protection comes from financial rights. Does it use the word protect, the statute? Well, FERC uses it when they interpret Congress. Well, the statute uses it. We aren't bound by FERC. The statute, it calls for . . . I think the answer is no. The word protect is . . . The word protect is not in the statute. Really, the statute orders FERC to enable these entities to secure something, to get something new, which is the financial right. So . . . That's the issue. Well, that is the issue. That's the ultimate begging of the question. But if you look at FERC's order, FERC addresses what it is, the program that it's setting up and whether it's providing anything at all. And they're very clear. I'll draw your attention to paragraph 69 of Order 681A. And FERC said, and this was in the discussion about when the financial rights are limited, and FERC said, indeed, as long as each load serving entity receives a reasonable allocation of these rights. And then it has an example of what . . . Well, there was some mischaracterization in FERC's order about what we were requesting. And FERC would have it . . . Okay. I was going to ask you, what remedy do you want? The remedy is fairly basic. It's really . . . What is it? It's an evidentiary hearing at FERC because there are really two parts. What remedy are you going to request at that hearing? That we . . . You've got the transmission rights. What are you going to request? That we have financial rights, hedges, that are . . . Retroactively. You want them retroactive. Raises the question, who pays for it? So, there's really . . . Answer the question. I'll answer that. So, the complaint has two time periods. One is back to 2016. Missouri River should have received this. That's what I care about. Right. Well, we also care about going forward as a . . . The other question is, what are you getting now prospectively? Right. That's important. And right now, since 2016, we've gotten zero long-term hedges. And this contract that Missouri River is obligated under goes through 2040. So, there's 15 more years. And we were supposed to get long-term hedges for all of these years in the past. Use the word hedges and use the word supposed to. And we've talked about the statute doesn't say what you say it says explicitly. Well, the statute, it does establish a right to secure something. And we could debate about what exactly we're talking about securing. But that really wasn't disputed in the FERC proceeding. Everyone, both sides knew we were talking about these hedges. And the question was whether FERC . . . Who are both sides now? Well, now it's Missouri River and . . . SPV? Southwest, but also FERC. We're asking that the FERC order be reviewed and remanded. Okay. I still . . . I want to know what your client wants at the end of this process. Having opposed every step along the way for at least 12 years. Well, I would say we simply want what FERC provided for in its rulemaking. Because FERC . . . Tell us what it is. Specifically, what would be the remand? Well, it would be hedges . . . You want the same amount of rights that every other entity has? What do you want exactly? We want hedges that, at the very least, would hedge for our baseload capacity. And if that capacity isn't there? Well, we know some capacity was there when Missouri River joined. I know. So, one of the parts of this is that Southwest said . . . You want to unravel what was done before you joined. You know, there are a variety of remedies that FERC can reach under the Federal Power Act. It would have been helpful if you'd tell us about all those so we could evaluate the propriety of not giving you that relief. You didn't do that. All you want to do is talk about supposed to and protect and secure. Well, FERC's underlying order did not go to the remedy aspect of this case. So, we didn't ask for a review on remedy because they never reached remedy because they said you're entitled to nothing. If you didn't think we'd care about . . . No, I . . . I mean, that's crazy. You don't understand our limited role in this entire process. Well, I think the remedy that this Court can provide is first to interpret . . . tell FERC that its interpretation of the statute in its own rulemaking . . . I want to know if what you are looking for is to disrupt . . . is to claw back from customers or competitors or maybe the taxpayers what your client is disappointed it hasn't been given. No, we're not asking for a clawback. You make it sound like you are. So, Southwest and . . . Wait a minute. Yep. How do I gain any comfort from your papers that you're not seeking a clawback? Well, we reference Federal Power Act Section 309, which empowers FERC to broad remedial authority. Broad remedial authority. I know what you want. So, in the past, in other proceedings . . . Who suffers when your client gets its recompense? So, as for . . . Answer the question. I'll answer the question. So, Southwest has done what's called an uplift charge, which socializes a cost like this to all of Southwest repairs. So, that's one remedy. Well, that would . . . So, retroactively, that would claw back from . . . No, there's . . . . . . other participants. In that scenario, there's not really a clawback. We're not taking dollars from . . . Rate increase going forward that would be used to pay you for . . . That's correct. So, it's a rate increase for the rate payers. Correct. That would be spread across the entire zone. But, that would be for the retroactive piece. For the prospective piece, it would simply be small adjustments to how these hedges are allocated going forward. Small adjustments, meaning everybody else has to lose some of what they have so you can get some? Well . . . Consider that small, but that would be the way it would work? Certain rights are removed from another party and given to . . . Yes, potentially. I will note that in multiple places, FERC envisioned that. So, I'll draw your attention to . . . Multiple places in this record, or . . . Well, it's in the implementing rulemaking, Order 681. Where do you get out of the statute that every road-serving entity must receive rights? Well . . . Most of the aggregate group of entities. Well, I would say that the statute . . . It used some unqualified terms like secure and the reasonable needs of load-serving entities. Now, they could have . . . Congress could have said . . . It doesn't say each load-serving entity. It does not say the word each. But, you know, Congress could have written it, you know, secure, comma, if reasonable. Something like that. But, it doesn't qualify like that. It says . . . it just says secure. And, it does say reasonable needs. So, reasonable needs, that there's a range there. And, the Commission discussed the upper point of that range. And, it managed expectations and said you might not get all of your . . . all of what you requested. But, in doing so, FERC never said, and you might not get any. So, the . . . And, if zero was a reasonable . . . If FERC envisions zero being a reasonable allocation, I think it would have said so. But, you've gotten the energy. When they said so . . . We're just talking dollars. We are just talking dollars. So, get any . . . FERC never said nobody gets . . . nobody will not get any. What's the get . . . what's the any? Well . . . A nickel or energy? Well, I think what Congress said was to meet your reasonable needs. So, something nominal probably wouldn't be enough. It's . . . and, you know . . . What's the objective? Well, the . . . Of the group, regulating the group on . . . Well, clearly, Congress . . . Congress was reacting to these new charges which were being assessed. And, this portion of the statute was to protect this class, load-serving entities, against these new charges. And, that's all that Missouri River seeks here. And, Missouri River really is the embodiment of the type of entity which Congress was concerned about in the statute. Isn't the reasonable needs language tied to the transmission facilities? And then, separately, there's a reference to the . . . So, it . . . Enabling the load-service entities to secure firm transmission rights. It . . . That's not connected to this reasonable needs language. I think it is. My reading here is . . . it's . . . you're right. The . . . it first mentions to meet the reasonable needs of load-serving entities. And then, later in the parenthetical, it ends with to meet such needs. I think the such is the reasonable needs of the load-serving entities. I'll reserve the rest of my time for some rebuttal. Very well. Thank you for your argument. Ms. Banta, we'll hear from you. Have you allocated this time in any particular way? Yes, Your Honor. Good morning. You just have to watch the clock, then, if you want. Whatever you use will be used, then. Of course. Mr. Bannett can have whatever remains. Of course. Very well. You may proceed. Good morning. I'm Carol Banta for the Commission. And, as noted, we have agreed to share five minutes of our time with counsel for Southwest Power Pool, Mr. Bannett. I think I'll begin with some of the . . . If you'd speak up and a little slower, it would help me. Okay. Speaking up is easy. Slowing down, I'd have to remind myself. Aim for the microphone. That'll help the best on hearing you. Adjust it. Okay. Move it. Is that better? Yeah. Okay. Okay. Being too quiet is not usually my problem. I'd like to begin with some of the Court's questions to Missouri Rivers Counsel. In particular, what is it that Missouri River wants retroactively? And that was the bulk of what this dispute in front of the Commission was about. And that's the problem, because what limited hedging rights there were for the very specific path that Missouri River wants were allocated before Missouri River was a member of SPP, so before it was able to put in any nomination for any such rights. And those rights, once granted, the statute is very clear about the long-term basis. And the way the Commission had implemented Congress's directive to make these rights available on a long-term basis, it had said you can do it in terms or you can do it with some kind of rollover. It has to be at least 10 years if it's a term. And the way Southwest Power Pool specifically chose to do it for its region, as designed in consultation with its stakeholders, was to have one-year terms that automatically roll over so long as the load-serving entity still wants it and is still using that path for it. Okay. Let's go to that. Missouri River gave FERC an expert report about miscalculation and says, okay, assume everything you believe, FERC, and everything you say is true, you've just miscalculated it. And as far as I can tell, you all say, well, they use different software. And FERC just accepted what SPP said about the software, as I understand it. And so are your factual findings supported by evidence, you know, ignoring the rest of the case and coming down just to that fine point at the end, and does that warrant a remand to figure out what the dad burn software was all about? No, it does not warrant a remand. Please tell me why. Sure. Well, first of all, as the Commission noted, given that the complaint was about alleged violations of the tariff, the tariff does not contain any provisions about how Missouri River, I'm sorry, how Southwest conducts the simultaneous feasibility test. It does require in the tariff the conduct of a simultaneous feasibility test, but it doesn't specify the software or particular parameters for that. So Southwest, having chosen a particular custom-built for it software to do this test, argued that the evidence that Missouri River had put in, which was its experts and someone internally at Missouri River, each using completely different software, got some different result, which didn't even agree with each other. And Southwest Power Pool said, there's nothing in the tariff that says what software we have to use. And you didn't use the software we use, which my understanding, and perhaps Mr. Burnett can speak to this more, they offered that possibility to Missouri River if it wanted to explore the results using the same software. But Southwest Power Pool explained, because you can rebut someone's burden by poking holes in their evidence. And what they did is they said, your evidence shows nothing. Because you used some other software, you get two different results that don't even agree with each other. That doesn't tell you anything about our software, Southwest's software, even assuming that it would be a tariff violation if we somehow, if the software got it wrong. And so the commission just said, you haven't made your case because we, being a technical agency, we have staff that understands these kinds of things and the technical expertise in the agency. We found that poking holes in the evidence to be sufficient. Did FERC say that, poking holes in the evidence and do this on, I heard from you a burden of proof argument, candidly. Tell me if I heard wrong. No. I heard you a burden of proof. That's right. And in FERC's order, do they say that? Well, I'm looking at Appendix 400, at paragraph 64 in the first order. Okay. Hold on one second. Let me get to 400. Sure. And while you're getting there, I will say. I went to 400. Go ahead. Which paragraph? Which paragraph? It is paragraph 64 in the complaint order. But before I get to that exact language, I do want to just point out that there is a body of case law saying that the Commission is not required to use, quote, magic words. So we may not have said we are exercising. The order may not say we are exercising our technical expertise. But that is what the Commission does in these orders. In paragraph 64, it summarizes what Missouri River had put in and what Southwest said about it. And it says about midway through paragraph 64, we agree with SPP that it is reasonable that a small shift factor in one direction, calculated by one software package, could swing to being a small shift factor in the other direction under other software. So that's saying we agree with Southwest's rebuttal of the evidence. Okay. Thank you. So what about the bigger issue in the case, namely whether the agency is required to give each load serving entity some of these rights? Well, and that goes largely to the original rulemaking in order. Can I just ask a follow-up? Oh, sure. In your view, does the file rate doctrine affect this? In other words, does the file rate doctrine prevent us from requiring a hearing on whether the agency was reasonable in this part of its analysis? I don't have that out from the briefs. As to which part, the shift factor? File rate doctrine keeps popping up, and of course it's important, and we enforce it. Yes. But does it apply to the question of whether we could remand for a hearing and a better explanation on this software question? Well, the commission — The tariff doesn't require this. Right. But is that a defense to this issue? On that issue, the commission said it's not part of the — which software you use isn't even in the filed rate. So that's why the commission found no tariff violations. So I'm not — I think that the file rate would not actually cover that. It would not — is not relevant to this part of the issue. I think that's right, given that it's not in the filed rate. But — I thought Judge Compton had a question. Go ahead. Okay. Go ahead. Yes. So going back to the Order 681 rulemaking, the commission was looking at what the statute said, because there are other key words in the statute as well besides — sorry — the ones that Petitioner has pointed to. And that is — includes firm and long-term basis. And so the commission spent a lot of time in Order 681 talking about how these different regions could design a form of financial hedge that would be firm and on a long-term basis. Counsel, did — that was the reason I was deferring. Did you ever answer Judge Collins' question about how it says you have to — I'm talking about the statute right now — that the statute says you really have to enable a load-serving entity to secure its own? Well, it doesn't say to enable a specific load-serving entity. And I believe the Court actually had a similar discussion about a statute yesterday about a word A versus not. What about this statute? What's your view on what the statute requires as to each entity? The way the commission understood it in Order 681 is that each region had to design a kind of financial right that would satisfy being firm and long-term for this purpose. But the commission said repeatedly that that did not guarantee that load-serving entities would get the particular rights that they wanted, because the key word that came through firm in particular is the simultaneous feasibility. And there was discussion in the Order 681 rulemaking about whether the regions had to allocate rights to their existing capacity or whether this statute only applied forward-looking to new expansions of capacity. And the commission said, no, no, it does include how we're going to divvy up the rights to the existing capacity. But the commission recognized throughout the rulemaking that existing capacity, that there can be scarcity problems, especially on some congested paths, and that there will be financial rights that are limited or not feasible for that reason. So there's great discussion about how each region can decide how much of its maximum capability it is able to commit on a firm long-term basis, meaning that if you're going to make that commitment, you need to be able to honor it. So you think the problem here comes down to the fact that Missouri River came in later and the agency's saying we don't want to retract anything from what we've already offered the others? Well, not just that we don't want to, but if you look at the long-term basis. Didn't do? I think that that's right. Is that what you're saying? Yes, because at the time of the initial allocation, Missouri River was not in Southwest. Now, the problem is that the particular path they want and the only one that they've nominated each time is one of the most congested paths. And their nomination each year has a great impact on one of the most constrained points in the entire system. So the problem is that the limited feasible rights had already been allocated, to be clear, to a load-serving entity, not to some speculator or some other player, but someone with the same concerns. And I believe that there was at least one other load-serving entity who I think maybe also came in later who wanted that same path and didn't get it. mentioned them in one of their filings, an entity called Basin Electric. It got other rights on other paths, but it wasn't able to get it for this. Because once allocated to whoever was there in the pool asking for the rights to the existing capacity, once honored, those have to be honored on a long-term basis. And that does go to the Court's question about wanting to unravel or claw back, or I believe somewhere in one of the filings, I can't find it, I think Missouri River referred to it as diluting, diluting other entities' rights. And there is language in the statute that goes directly to the inability to do that. Counsel, to make it short, and I bet you get it, that FERT believes that, quote, firm transmission rights must be both physical and financial by Order 681, right? Yes. Okay. So you don't buy the or argument on the statutory language, right? I think they're talking about different things, yes. How can they be talking about different things when they use the same words? Well, I think we do agree that in Southwest Power Pool, it has gone with the financial rights aspect in the statute and not strictly the firm transmission rights. That's my understanding. Okay. I expected that. So thank you for confirming, though, just to be sure. Sure. I think, based on, if the Court has no further questions, I think I'll cede the rest of my time to, or you do. What about this, the lawyer for Missouri River referred to this portion of 681A that talked about ensuring a reasonable allocation of rights. Has FERT committed itself to giving each entity a reasonable allocation, do you think? Well, no. I think because, for one thing, we in our brief cited many other places in 681 and 681A that said there is no guarantee. And in addition, the Commission said the same thing in the compliance orders in which Southwest the Commission approved Southwest's, I didn't bring it up here with me, the 2015 order that we had cited in our brief. Sorry, I'm not near the microphone. The 2015 compliance order approving Southwest's proposal for how to implement Order 681. The Commission acknowledged there that there would be entities that wouldn't get what they wanted because of congestion in particular places. So in Order 681 and the seven guidelines that the Commission issued as a regulation, it's about setting up how each region, the characteristics that this new product in the energy market has to have. But feasibility and scarcity and the inability to guarantee that everybody gets what they want is discussed throughout the orders. Very well. Thank you for your argument. Thank you. Mr. Burnett, we'll hear from you. Good morning, and may it please the Court, Matt Burnett for Southwest Power Pool. I'd like to start where Judge Benton was going with the software. In this case, three different entities calculated three different shift factors using three different pieces of software. The difference between the software was Missouri River and its consultant used this generic off-the-shelf software that you can use to do basic modeling on any transmission system in the country. SPP went out and sought a vendor who developed a program called iHedge that specifically is designed for not only the SPP transmission system but also the rules in SPP's long-term transmission rights market, which include a concept called an options-style approach. Since I started this, thank you for covering that. I really want your opinion. You're a party in this case, right, in any sense the word party? Yes. Correct? Okay. Do you read the statute that what you have to have because the or is there, either firm transmission rights or equivalent trade or financial rights? On a personal matter, I've always struggled with that language because there is an or in there. What's the position of your client? The position of my client is that FERC issued Order 681, which said you must offer firm and financial, and so SPP submitted a compliance filing to comply with what FERC had ordered. Whether what FERC had ordered is actually what the statute necessarily requires is not an issue that we really reach because our job is just to comply with the FERC statute. As you said, you did not raise the issue. We did not raise the issue. Okay. Good. Did the other party in this case, sorry, I've forgotten their name for a second. There's another party. Yes, Nebraska Public Policy. Thank you very much. A public entity. Yes. As I understand. Now, did that party raise the issue of what the statute actually says? I don't believe they did. Okay. What's your position on whether we reach it or not? Well, I think you have an obligation as the Court to review FERC's actions in light of the statute. And so, you know, your job is to look at the words of the statute and, you know, determine if they're vague or unclear, and then apply your standard statutory construction tools to figure out whether FERC's reading of the statute is permissible. Thank you, counsel. And I think part of that you would want to look at. If you determine that the statute is unclear, you'd want to look at, among other things, the legislative history. And I would draw your attention to a Senate report. Over the plain language of the statute, you would look at the legislative history? No. If you agree that the plain language is ambiguous, you would look at the legislative history. Oh, okay. Good. I'm sorry if I misstated that. Yeah. Yeah. And I would refer you to a Senate report that was issued by the Senate Natural Resources and Energy Committee on June, looks like June 9th of 2005, where they were talking about this very provision. The numbering is not right because the numbering in the statute moved, but basically what the committee said was the language in subsection C is intended to provide the commission with flexibility in taking into account its policies as opposed to the strict letter of subsections B-1, B-2, and B-3. What the Congress was talking about here was how you design these long-term transmission rights markets. Is that the report number? I'm sorry. That's report number 10978. And it talks specifically about a different regional transmission organization, the Midwest ISO. They were, at the time, in the process of designing this type of market, which I believe is why Congress was addressing them specifically. But it also says that nothing in this section is intended to guarantee that an entity shall be entitled to a particular financial transmission right allocation, to be held harmless from applicable congestion charges, or to be exempt from applicable congestion management methodology. So it's clear to me that if you find that this statute is ambiguous, this is helpful as to the intent of Congress at the time. So if I could just quickly get back to the two errors that Missouri River alleges that SPP has engaged in. One is the software. If you look at their own evidence, their witness from the Brattle Group at pages 13 and 14 of his report talks about how he questioned the validity of an option-style approach to the congestion rights market, but he never actually said that he did anything in his results. And also, and I believe my colleague Ms. Banta mentioned, Missouri River had the opportunity to purchase the custom-designed software and didn't do so. They opted to use this general software that doesn't really model the market the way that SPP's market is designed to be modeled. If I could just quickly address one other point on the other flaw that, or the other error that Missouri River alleges, which involves a parallel path. They claim that we admitted that we released their parallel path. We didn't. I think the record is clear that we talked about the various components that go into determining the system capacity. And I would draw your attention to our second answer, and I believe it's on page 13 where we talk about that. And then there's also an email chain in their own evidence that where SPP employee Micah Bailey explains that the 2015 parallel flows were accounted for and then were released in 2016 when they were no longer parallel flows. If there's no questions... Say that last thing again, Bailey? Yeah, Micah Bailey. I can find you the... It's actually, if you look at appendix page 247. Okay. Thank you. Yes. If there are no other questions, thank you all for your time. Thank you. Thank you for your argument.  Nobody was talking during your argument. I apologize for that, Your Honor. You can hand notes if you need to. You're right. Just a few points. This shift factor discussion, that's a fact in dispute. We have our own analysis. We have our outside consultants' analysis. And Southwest has theirs, but they never put that into the record. And that was one of the failures that we've alleged here is that then in the order denying our complaint, Brooke just agreed with Southwest's assertions about it. Southwest did not submit any evidence. There was no affidavits or anything. It was just legal pleadings signed by their attorney. So there's really a failure there, and that's why one of the key remedies here is an evidentiary hearing. Also, just to explain the shift factor, that's key. That's essentially Southwest's tariff is trying to say how you should calculate congestion. And Southwest, their shift factor says that Missouri River is one of the causes of the congestion. Well, Missouri River's and Missouri River's consultant says it's not. It's essentially, it's just not a factor at all. So Southwest tries to minimize the differences, and so does FERC. And it's sort of saying like, well, a positive and slight change could go negative. Well, that's the difference right there. Is it causing it or is it not causing the congestion? Now, what happens in the marketplace during the two or three years it will take to have this hearing you're dying for? Well, for prospective relief, it wouldn't under Federal Power Act Section 206. If FERC eventually says, you know, hey, we need a change here prospectively, then the remedy would only be prospectively available. But again, two to three years, we have 15 more years on the contract, so there's a lot of value there. In fact, more than in the... I'm more concerned with the retroactive claim. Well, I will note... The meter is running for the clawbacks your client wants? It is, but, you know, in FERC's own... Is that consistent with the statutory purpose? Well... To litigate this thing as long as there's still a way of resources to litigate? The statute asked FERC to set up this program, and then FERC issued its implementing rulemaking. And FERC addressed problems like if an entity is being crowded out, it used those terms, crowded out, we will remedy that. So FERC, you know... When where's the crowding out when we're just talking dollars? Well, because... From the standpoint of energy consumers. Well, so this gets back to the either or question, and you firm transmission rights or financial rights. It's a practical question. It is. So as soon as congestion started being charged for, Missouri River's transmission rights were no longer firm. Suddenly their costs were going up. Congestion has been charged for in the utility business forever. One way or another. I represented the MAP power pool five generations ago, and the issues were basically at root the same. Well, I would say it was different once we had an organized market and suddenly you were getting these charges on your bill. It was both an organized market. I was a law clerk during the first Manhattan blackout, which ran all the way up to New England. That was an organized market, and it broke down. I believe the reason why Congress passed this law is they wanted to protect low-serving entities, which suddenly were being charged with new charges, and that is undisputed. It's also important to remember here that FERC has tried to change what it said in Order 681 from providing a right to obtain, which is mentioned again and again, to a right merely to nominate for these hedges, and that's fundamentally different. A right to nominate is potentially worthless, and here Southwest, when Missouri River went in, became part of Southwest and requested hedges, they said none were available. Are there any more questions? Thank you for your argument. Thank you to all counsel. The case is submitted and the court filed a decision in due course. Counsel are excused. Thank you. Thank you.